IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 8, 2020

**STATE OF TENNESSEE v. RUBEN WALTON**

**Appeal from the Criminal Court for Shelby County**
No. 18-00920      James M. Lammey, Judge
—————————————————————

**No. W2019-01762-CCA-R3-CD**
—————————————————————

A Shelby County jury found the defendant, Ruben Walton, guilty of second-degree murder, and the trial court imposed a sentence of twenty-two years to be served at one hundred percent. On appeal, the defendant challenges the sufficiency of the evidence supporting his conviction, two evidentiary rulings of the trial court regarding threatening statements the defendant made prior to the murder, and his sentence. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J and ROBERT W. WEDEMEYER, J., joined.

Phyllis Aluko, District Public Defender; Barry W. Kuhn (on appeal) and Neil Umsted and Jennifer Case (at trial), Assistant District Public Defenders, for the appellant, Roy Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

This case stems from the strained familial relationships between the defendant, his wife, Melissa Walton, and members of her extended family. On September 20, 2017, the defendant shot and killed the victim, Israel Falkner, Jr., in Shelby County, Tennessee. After turning himself into police, a Shelby County grand jury ultimately indicted the

defendant for first-degree murder. The defendant proceeded to trial which began with a jury-out hearing addressing the defendant's motion *in limine* to exclude any out-of-court statements made by the defendant. The initial hearing concerned two statements the defendant made to Sharese Falkner, the victim's mother and Ms. Walton's aunt, prior to the shooting in 2017.

Ms. Falkner testified that the first statement occurred after the defendant and Ms. Walton got into "a situation" at their home in Southaven, Mississippi. The defendant and Ms. Walton called Ms. Falkner and took turns speaking to her on the telephone. During the call, the defendant threatened to harm and kill Ms. Walton and members of her family, and Ms. Walton expressed that she feared for her life. Ms. Falkner testified that during the conversation the defendant "said that he wanted [Ms. Walton] to choose a gun so he could kill her with it," he "wanted to do something to hurt [Ms. Walton]," and he planned "to do things to hurt family members to get at [her]."

Ms. Falkner then detailed a separate, in-person conversation she had with the defendant in April of 2017. After the defendant and Ms. Walton got into an altercation, Ms. Falkner went to their home and spoke to the defendant in the garage. During the conversation, the defendant again expressed that he wanted to kill Ms. Walton and members of her family. Specifically, the defendant planned to hurt Ms. Falkner's sister and other family members "for the hurt and pain that [Ms. Walton] had caused him." Ms. Falkner believed the defendant could act on his statements as he "was so passionate about it" and had access to guns. When further questioned by the trial court, Ms. Falkner explained the defendant was upset during the garage conversation and noted the defendant "stressed to me that he wanted to kill [Ms. Walton] and kill family members because of the things that they had made him loose (sic) in his life, since he met her." The trial court analyzed the statements under Rule 404(b) and determined both statements were admissible. Specifically, the trial court determined Ms. Falkner's testimony were relevant as to the defendant's motive, his premeditative intent, and to provide the jury "the complete story." The State then presented its case in chief.

Ms. Falkner testified the victim lived with her periodically throughout 2017 at her home located in Shelby County, Tennessee. On September 29, 2017, however, the victim did not live with her but was visiting with his one-year-old daughter. Ms. Falkner's sister, Linda Stewart, was also visiting that evening. At approximately 7:00 or 8:00 p.m., the victim answered an unexpected knock at the door. Ms. Falkner could not see the door from her position in the living room but heard the victim say, "Ruben don't come here with this mess." Ms. Falkner heard a loud noise and ran to the front door where she saw "a flash of fire" and the defendant "tussling" with the victim. Though she did not see any blood or hear the victim state he had been shot, Ms. Falkner asked, "Ruben, why you killing my child, why you killing my son, my baby." The defendant did not respond.

As Ms. Falkner attempted to intervene in the fight, the victim ran outside and collapsed in the driveway. The defendant calmly followed the victim outside, stood over the victim, and fired several gunshots with "a mean, hatred look on his face." Ms. Falkner again screamed, "Why are you killing my son, why would you kill my son, why would you do this to me, why?" She ran back inside the home and told Ms. Stewart to call 9-1-1. Throughout the incident, Ms. Falkner described the defendant as having a "straight, calm, cool, collected, look on his face."

After asking Ms. Stewart to call 9-1-1, Ms. Falkner went back outside and saw the defendant calmly walking down the street but did not see his vehicle. Vencent Thompson, a neighbor and the victim's friend, ran from his house and held the victim while Ms. Falkner remained inside until police and paramedics arrived. Ms. Falkner spoke with police after the shooting and provided a written statement. Ms. Falkner denied seeing any weapons in her home and stated the victim was unarmed at the time of his death.

Throughout her testimony, Ms. Falkner identified numerous photographs of the crime scene including the entryway and front door of her home and the exterior of her home depicting the area where the victim died and the path the defendant took as he exited the scene. She also identified the victim and the defendant in photographs and made an in-court identification of the defendant. All of the photographs were entered into evidence.

In addition, Ms. Falkner provided context to the strained familial relationships which led to the victim's death. Approximately one year before the shooting, the defendant and Ms. Walton lived with Ms. Falkner for about thirty days prior to moving to Southaven. During that time, the defendant and Ms. Walton's marriage was "[r]eally rocky," and the defendant confided in Ms. Falkner about his marital problems. Several times, Ms. Falkner intervened in the relationship between the defendant and Ms. Walton at their request. Ms. Falkner explained the defendant expressed his desire to hurt or kill Ms. Walton and members of Ms. Walton's family. She stated at the time of the victim's murder the defendant and Ms. Walton were separated.

Linda Stewart, the defendant's mother-in-law and the victim's aunt, testified she was in a bedroom of Ms. Falkner's home when she heard the defendant knock on the front door. After hearing "a lot of commotion [and] a lot of yelling," she came out of the bedroom and saw Ms. Falkner and the victim trying to close the front door. Ms. Stewart heard the victim say, "Ruben don't come in here with that stuff, Ruben what are you doing, why you rushin' up in my house like this, man?" She heard Ms. Falkner say, "Ruben please don't come in here with this, don't kill my child, don't kill my baby." Ms. Stewart then grabbed the victim's daughter and hid in the closet of a back bedroom. Ms. Stewart heard two gunshots and heard Ms. Falkner yell, "[h]e's killing my baby." When Ms. Stewart left

the bedroom and looked out the kitchen window, she saw the defendant standing over the victim who was lying on the ground. Ms. Stewart then heard four or five additional gunshots. Ms. Stewart testified the victim was unarmed prior to the shooting.

Memphis Police Department (MPD) Officers Christopher Sanders and Ricky Gray responded to the scene on September 29, 2017. Upon his arrival, Officer Gray found the victim unresponsive on the ground outside Ms. Falkner's home surrounded by numerous family members. Officer Gray secured the scene, interviewed witnesses, and developed the defendant as a suspect. Additionally, while testifying, Officer Gray described the events captured on his body camera which primarily consisted of his interactions with the victim's family. The State entered the body camera footage into evidence. While he was at the scene, Officer Sanders photographed and collected evidence which included a water bottle. The photographs showed the interior and exterior of Ms. Falkner's house, the victim's body lying on the sidewalk covered by a blue sheet, the house next door to Ms. Falkner's, and the water bottle. The photographs were entered into evidence along with a diagram of the crime scene. Officer Sanders did not recover any bullets or weapons from the scene.

As the investigation continued, MPD Officer Charles Cathey executed a search warrant against the defendant's white Ford Excursion on October 2, 2017. The search warrant returned a pistol, a Glock 9-millimeter handgun loaded with a live round, an assault rifle, a holster, a magazine with live ammunition, a mesh bag, and a box of ammunition. These items along with numerous photographs of the items were entered into evidence. Photographs of additional items found during the search, including clothing, a clothes hamper, a fireproof safe, and other personal effects were also entered into evidence.

Dr. Marco Ross, an expert in forensic pathology and the acting Chief Medical Examiner for Shelby County, performed the autopsy of the victim and determined the victim died from two gunshot wounds to the torso. Dr. Ross located a bullet in the left posterior of the victim's chest, noting the bullet penetrated the victim's chest, heart, left lung and left, seventh rib. Dr. Ross described the resulting wound as fatal with significant blood loss. The second bullet entered the right side of the victim's mid-back area and traveled upward toward the right lung, the right sterno-clavicular joint, and the aortic arch, "which is the main blood vessel coming out of the top of the heart curving around down into the chest and the abdomen." Dr. Ross recovered this bullet underneath the skin in front of the victim's sterno-clavicular joint. He stated this wound likely would have caused bleeding in the chest cavity and caused the victim to make a gurgling sound due to the presence of blood in the airway. Dr. Ross stated both wounds would have been fatal independently of one another as each caused significant blood loss. He could not, however, determine which wound occurred first. Photographs of both the entrance and exit wounds were entered into evidence along with x-rays of the victim. The two bullets recovered from

- 4 -

the victim's body and photographs of the same were also entered into evidence. Though there were defects in the victim's clothing from the bullets, Dr. Ross was unable to opine the distance from which each bullet was fired.

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation testified as an expert in the area of firearms identification and ballistics analysis. She examined the Glock 9-millimeter pistol, fifty-one 9-millimeter cartridges, and three magazines recovered during the search of the defendant's vehicle along with the two .38 caliber bullets recovered during the victim's autopsy. Special Agent Braswell determined the bullets recovered during the autopsy were not fired from the Glock 9-millimeter pistol found in the defendant's vehicle. By comparing the two autopsy bullets, Special Agent Braswell determined the .38 caliber bullets were fired from the same, albeit unknown, firearm. She analyzed the bullets in the F.B.I. database and determined the bullets could have been fired from a different 9-millimeter pistol, a .357 Magnum revolver, a .357 Sig automatic pistol, or a .38 Special revolver. Special Agent Braswell testified a .38 Special would fit in the holster recovered from the defendant's vehicle.

Finally, the State called Vencent Thompson to testify. At the outset of his testimony, the trial court conducted a 404(b) hearing outside the presence of the jury as the State sought testimony from Mr. Thompson regarding a threat the defendant made to the victim prior to the shooting. During the hearing, Mr. Thompson explained the context of the threat, noting it stemmed from an exchange of weapons between the defendant and the victim. In June or July 2017, the defendant called the victim in an attempt to get the victim to return the weapons the defendant had given the victim. At the time of the telephone call, the victim and Mr. Thompson were together, the victim put the telephone call on speaker phone, and Mr. Thompson heard the defendant threaten the victim and claim to be a member of the Gangster Disciples Crip. The trial court determined the threat was admissible under Rule 404(b). Specifically, the trial court determined the threats related to the defendant's motive and "general animosity towards the victim's family." The trial court then offered to separately analyze the gang-related comment. The defendant declined but again noted his objection to all of the proffered testimony. Mr. Thompson then testified for the jury.

Mr. Thompson stated he has a history of felony drug and theft convictions and was currently in jail for an aggravated robbery conviction. Mr. Thompson described the victim as his friend and neighbor. On September 29, 2017, Mr. Thompson was inside his home when he heard three gunshots and screams. When he looked outside, Mr. Thompson saw a body on the ground and the defendant "squatting" over the body. After a couple of seconds, Mr. Thompson stated the defendant "stood up and shot [the victim] one more time and walked off." Mr. Thompson then ran from his home past the defendant to the victim, pleading with the victim to "get up." The victim, however, did not move. Mr. Thompson

did not see any weapons on the victim and did not see the defendant get into a vehicle. Mr. Thompson remained on the scene and spoke with the police upon their arrival. He identified his home and Ms. Falkner's home in several photographs previously entered into evidence.

Mr. Thompson then described a threat the defendant made to the victim prior to the shooting. After meeting the defendant in 2017, Mr. Thompson learned the defendant gave the victim several weapons which included a ".22 handgun revolver[,] a .20 gauge[,] and a .12 gauge." This exchange led to a disagreement between the defendant and the victim. One evening, the defendant called the victim while Mr. Thompson and the victim were together. The victim placed the call on speaker phone, allowing Mr. Thompson to hear the conversation. During the call, the defendant asked the victim for his weapons back. After the victim indicated he did not want to give the weapons back, the defendant stated, "I'm a Gangster Disciple Crip, or else." The victim responded, "Don't come over to my momma's house with none of that foolishness, if you do, you're going to have to kill me." According to Mr. Thompson, the defendant calmly responded, "okay, watch your back." Mr. Thompson acknowledged the defendant's claim to be a Gangster Disciple Crip was "gibberish" as you cannot be in multiple gangs. Finally, Mr. Thompson believed the victim sold the weapons at issue and denied attempting to purchase a weapon from the defendant himself. The State then rested its case.

The trial court denied the defendant's motion for a judgment of acquittal after which the defendant testified on his own behalf. The defendant described his relationships with his wife, Ms. Walton, and her extended family which included the victim, Ms. Falkner, and Ms. Stewart. In the summer of 2016, the defendant, Ms. Walton, and their children lived with Ms. Falkner for approximately one month. The defendant and his family then moved to Southaven after which the defendant developed a relationship with the victim. In March 2017, the victim asked the defendant for weapons, and the defendant gave him a .22 revolver and a .12-gauge shotgun. The defendant denied giving the victim a .20-gauge shotgun despite Mr. Thompson's testimony. After giving the victim the guns, the defendant grew uneasy and asked the victim to return the guns. The victim, however, refused to do so and told the defendant that he had sold the guns in May of 2017. The defendant did not believe the victim. Additionally, as of May 2017, the defendant separated from Ms. Walton, and he did not see the victim again in person until the night of the shooting. In his continued effort to get the guns back, the defendant had several conversations with the victim via text messages and asked Ms. Walton to try to get the weapons through Ms. Falkner.

Regarding his interest in and knowledge of guns, the defendant explained he first purchased a gun in 1995. He served in the military for nine years during which he learned

how to fire and maintain weapons. Aside from the shooting at issue, the defendant stated he last fired a gun in September of 2008 which caused a panic attack.

The defendant then detailed the actions he took prior to shooting the victim. At the time of the shooting, the defendant was separated from Ms. Walton and living in Hot Springs, Arkansas. On September 29, 2017, the defendant drove from Hot Springs to Southaven to spend time with his youngest daughter. Though he felt "a little uneasy" on the drive, the defendant continued to Southaven, had work done on his Ford Excursion, and picked up his daughter from daycare. At approximately 5:00 p.m., the defendant took his daughter to the park and then waited for Ms. Walton at her apartment. When Ms. Walton returned, the two got into a verbal argument which resulted in the defendant driving to an ATM in Memphis in order to get $80.00 that he owed her. Upon leaving Southaven, the defendant removed the .38 caliber pistol, which he often carried while in Memphis, from his holster and placed it in the right pocket of his hoodie.

After visiting the ATM, the defendant's plans changed. Instead of returning to Southaven, the defendant went to Ms. Falkner's home to confront the victim about the guns. The defendant "was determined to get the guns back" and believed he needed to ask the victim for the guns in person. The defendant explained, "maybe if [the victim] sees the seriousness of my face and how concerned I am, he'll turn over the weapons to me." Accordingly, the defendant drove to Ms. Falkner's house and parked around the corner, claiming he feared the victim might shoot him if he pulled into the driveway.

The defendant walked to the front door of Ms. Falkner's home and knocked in a way that would be "familiar" to the victim. The defendant demonstrated the "special knock" for the jury. When the victim opened the door, the defendant stepped inside the entryway approximately one foot from the victim and stated he was there to retrieve his guns. The victim asked why he was there so late and pushed the defendant. When the defendant repeated that he wanted his guns, the victim pushed him again. The defendant warned the victim not to push him again as he was holding a pistol. After the victim pushed the defendant a second time, Ms. Falkner intervened. At this point in the altercation, the defendant stated his pistol was out of his pocket, and the victim had one hand on the gun. According to the defendant, the first gunshot occurred when the victim attempted to grab the gun. The defendant stated he did not know if the victim was armed during the altercation.

After the initial gunshot, the defendant explained he was "devastated" and could not "wrap my mind around what is happening to me." As the altercation continued, the victim ran out of the house, and Ms. Falkner yelled, "Ruben why are you shooting my son, why did you shoot my son?" As the victim crossed the front yard, the defendant worried the victim was going to his car to retrieve a weapon. The defendant explained he was "facing

a moral dilemma, because I've got somebody that's tried to kill me and what am I going to do to protect myself." As such, the defendant fired two shots at the victim's back, noting only one shot hit the victim. The victim collapsed, and the defendant approached him on the ground. The defendant stated: "I stood over him, I said a prayer and I said, well I don't want him to suffer, so I placed one in his chest and I figured that way it would be quick and easy and it would be done." The defendant then put the gun back in his pocket and walked away.

After shooting the victim, the defendant traveled to Blytheville, Arkansas and began receiving calls and messages asking why he killed the victim. Though the defendant did not "recall that," he turned himself into the Memphis Police Department. The defendant testified he did not intend to kill the victim on September 29, 2017. At the time of trial, the defendant was still married to Ms. Walton and was taking anti-psychotic medication. The defendant denied the police ever responding because he had threatened Ms. Walton and members of her family. Regarding the numerous weapons found in his vehicle during the search, the defendant explained he was storing his weapons there in order to keep them away from his brother's son who had recently been diagnosed with schizophrenia.

At the conclusion of trial, the jury returned a verdict of second-degree murder. After a sentencing hearing, the trial court sentenced the defendant to twenty-two years' confinement to be served at one hundred percent. The defense filed a motion for new trial which was denied by the trial court. This timely appeal followed.

*Analysis*

On appeal, the defendant presents several issues for our review. First, the defendant challenges the sufficiency of the evidence supporting his conviction, suggesting the evidence might be sufficient to sustain convictions for voluntary manslaughter or criminally negligent homicide but not second-degree murder. The defendant also challenges the admission of testimony from Sharese Falkner and Vencent Thompson regarding threats the defendant made prior to the murder as inadmissible under Rule 404(b) of the Tennessee Rules of Evidence. Finally, the defendant argues the trial court abused its discretion in sentencing him to twenty-two years' incarceration. The State asserts sufficient evidence exists to sustain the defendant's conviction, and the trial court did not err in its admission of 404(b) evidence or in sentencing the defendant. Upon our review of the record, we agree with the State and affirm the judgment of the trial court.

I.      *Sufficiency of the Evidence*

The defendant challenges the sufficiency of the evidence supporting his conviction for second-degree murder. When the sufficiency of the evidence is challenged, the relevant

question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.

*Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Id.* at 105 (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Here, the evidence is sufficient to sustain the defendant's conviction for second-degree murder. Not only did the defendant admit to shooting the victim numerous times, but his testimony also corroborated the evidence presented by the State. Prior to the murder, the defendant loaned the victim several guns. On September 29, 2017, after getting into a verbal altercation with his wife, the defendant drove to Memphis armed with a .38 caliber pistol and decided to confront the victim about the guns. The defendant was determined to get the guns back and hoped if the victim saw him in person, he would be successful. In an attempt to conceal his approach, the defendant parked his Ford Excursion, which was filled with weapons, out of sight from Ms. Falkner's home. The defendant was armed with a .38 caliber pistol hidden in the pocket of his sweatshirt. The defendant knocked on Ms. Falkner's front door in a manner the victim would recognize, and the victim opened the door. The victim indicated he did not want the defendant in the home, and an altercation ensued. The defendant fired two gunshots during the altercation at the front door, and the victim ran. As the victim ran, the defendant fired two additional gunshots at the victim's back. The defendant testified one of the bullets hit the victim causing him to collapse. The defendant then approached the victim, who was incapacitated on the ground, and shot him in the chest. The defendant walked away from Ms. Falkner's home and fled the state.

Ms. Falkner, Ms. Stewart, and Mr. Thompson corroborated the defendant's testimony, noting they heard numerous gunshots during the incident and saw the defendant shoot the victim. Dr. Ross testified that the victim suffered two fatal gunshot wounds and recovered two bullets from the victim's body during autopsy. Special Agent Braswell testified the bullets recovered from the victim's body were fired from the same weapon

which could have been a .38 caliber pistol. As such, the evidence supports the jury's finding that the defendant committed the knowing killing of the victim as it is undisputed the defendant shot the victim in the back and chest. Furthermore, the defendant testified he intended to kill the victim with the second shot to the victim's chest. *See* Tenn. Code Ann. § 39-11-302(b) (2014).

In support of his argument, the defendant generally suggests the jury should have weighed his testimony and version of events over the State's proof. Specifically, the defendant asserts "that the gun was fired after he was twice pushed by the victim" and that Ms. Falkner's testimony indicates that the victim's death might have been caused by the "tussle" at the front door. The defendant claims the State failed to disprove the victim's death was the result of "a physical attack by the victim upon the defendant that caused a state of passion in the defendant that caused him to act in an irrational manner." The defendant also argues the State failed to "disprove the possibility that [he] was only guilty of criminally negligent conduct that resulted in the death of the victim." We respectfully disagree with these arguments as the jury determines the credibility of witnesses and the weight afforded to the evidence, and this Court does not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Accordingly, this Court presumes any conflicts in the testimonies presented by the defendant and the State were resolved by the jury in reaching its verdict. *See Campbell*, 245 S.W.3d at 335; *State v. Adams*, 45 S.W.3d 46, 55 (Tenn. Crim. App. 2000). As such, we conclude the evidence presented was sufficient to sustain the defendant's conviction for second-degree murder. The defendant is not entitled to relief on this issue.

## II. *404(b) Evidence*

The defendant argues the trial court erred in admitting testimony from Ms. Falkner and Mr. Thompson regarding threats he made against Ms. Walton and members of her family prior to the murder. Regarding Ms. Falkner's testimony, the defendant generally asserts the threats she testified to are not relevant and are not admissible under Rule 404(b) as the threats "would only tend to show the character" of the defendant as a violent person. Similarly, the defendant asserts Mr. Thompson's testimony wherein he detailed a threatening statement the defendant made to the victim prior to the murder is inadmissible under Rule 404(b) as it too was only offered to establish the defendant as a violent person. The State asserts the testimony at issue was both relevant and admissible under Rule 404(b) as it was "probative of the [d]efendant's motive and intent to murder" the victim, and we agree.

Evidence introduced at trial must be relevant to the issues of guilt or innocence of the accused. Tenn. R. Evid. 401. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." *Id.* Even relevant evidence "may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403. Pursuant to Rule 404(b) of the Tennessee Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Id.*; *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). The rule sets out certain procedural requirements the trial court must satisfy before such evidence is admissible:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. *Jones*, 450 S.W.3d at 891; *see also* Tenn. R. Evid. 404, Advisory Comm'n. Cmt. The other purposes for which bad act evidence is admissible include motive, hostility toward the victim, malice, intent, and a settled purpose to harm the victim. *State v. Hawkins*, 519 S.W.3d 1, 45 (Tenn. 2017); *Smith*, 868 S.W.2d at 574. "Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent." *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008) (citing *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982)). Further, "'[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim.'" *Id.* (quoting *Smith*, 868 S.W.2d at 574). If it substantially complies with the procedures set forth therein, this Court affords great deference to the trial court's decision to admit evidence under Rule 404(b) and will only overturn that decision if the court abused that discretion. *Hawkins*, 519 S.W.3d at 45.

Here, the defendant does not challenge the trial court's compliance with the procedural requirements of Rule 404(b), and our review of the record indicates the trial court adhered to the same. Rather, the defendant argues the trial court erred in allowing the State to question Ms. Falkner and Mr. Thompson about prior threats the defendant made against Ms. Walton and her family, which included the victim, as evidence of his motive and intent to harm the victim. The defendant argues the threats made against Ms. Walton were not relevant to his trial and asserts the threats made against her family were inadmissible as it was unclear who the defendant was threatening in the statements. Additionally, the defendant argues the threats as testified to by both Ms. Falkner and Mr. Thompson were only offered to establish him as a violent person and thus, the testimony was inadmissible to prove action in conformity therewith pursuant to Rule 404(b). The defendant's arguments, however, are unpersuasive.

The record makes clear the defendant threatened Ms. Walton and members of her family numerous times prior to killing the victim. Ms. Falkner testified about two conversations she had with the defendant in 2017 during which the defendant threatened to harm Ms. Walton and members of her family. The trial court considered the ongoing threats the defendant made against Ms. Walton and her family as "part and parcel of the same thing." The trial court determined Ms. Falkner presented clear and convincing testimony that the threats not only illustrated "the complete story of the crime," but also showed the defendant's intent to harm the victim, a member of Ms. Walton's family. Similarly, Mr. Thompson testified about a specific threat the defendant made against the victim after the victim refused to return the defendant's guns. The trial court determined Mr. Thompson's testimony illustrated the defendant's motive in killing the victim, noting "other than the fact that [the defendant] just had general animosity towards the family, altogether, this [threat] as to this victim is pretty specific, so that makes its probative value pretty heavy."

Upon our review, we conclude the trial court properly allowed this line of testimony after complying with the requirements of Rule 404(b). The record indicates the defendant's threats were directed toward the victim both specifically and as a member of Ms. Walton's family, and evidence of the threats allowed the State the opportunity to establish the defendant's intent and motive to harm the victim. *Gilley*, 297 S.W.3d 739, 758. As noted above, the defendant, determined to retrieve his guns from the victim, initiated the altercation which led to the victim's death. During the altercation, the defendant fired numerous gunshots at the victim and testified the final gunshot was intended to kill the victim. Therefore, testimony of the defendant's threats made against Ms. Walton and her family were relevant and probative to the issue of the defendant's motive and intent to kill the victim, and the probative value of this evidence was not outweighed by the danger of

- 13 -

unfair prejudice. The trial court acted within its discretion in admitting the testimony. The defendant is not entitled to relief on this issue.

III.      *Sentencing*

Finally, the defendant argues the trial court erred in enhancing his sentence. The defendant contends the trial court improperly weighed the exceptional cruelty enhancement factor in sentencing him to twenty-two years in confinement, arguing "there were no acts done by the defendant that increased the pain suffered by the victim." The State argues the trial court properly weighed both the exceptional cruelty and employment of a deadly weapon enhancement factors in sentencing the defendant as the evidence shows "that the [d]efendant treated [the victim] with exceptional cruelty when he prayed for [the victim] and shot him in the chest." After our review, we conclude the defendant has failed to establish that his twenty-two-year, within-range sentence is improper. Accordingly, we affirm the sentence.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210(b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* Tenn. Code Ann. § 40-35-103(2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. Tenn. Code Ann. § 40-35-210(e).

After doing so, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210(c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Here, the trial court sentenced the defendant to twenty-two years' incarceration as a Range I offender for the Class A felony of second-degree murder. As a Range I offender, the defendant faced a sentencing range between fifteen and twenty-five years. Tenn. Code Ann. §§ 39-13-210(c)(1); 40-35-112(a)(1). As such, the twenty-two-year sentence imposed by the trial court falls within the applicable sentencing range for the defendant's offense and is presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *Caudle*, 388 S.W.3d at 278-79.

The defendant argues the trial court improperly enhanced his sentence by relying on the exceptional cruelty enhancement factor. Tenn. Code Ann. § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[.]"). The defendant, however, does not challenge the trial court's reliance on the deadly weapon enhancement factor. Tenn. Code Ann. § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]"). In assessing the applicable enhancement and mitigating factors, the trial court stated:

> All right. Looking at the enhancement factors as the State filed and of course the mitigating factors that the defense wishes for me to consider mental illness, unusual circumstances, his prior military service and lack of prior record.

> And the fact that he was considered a good father. It seems to me like he loved his children. So, I suppose that is true. He is a standard Range 1 offender.

Shows no prior history of criminal convictions or criminal behavior except I guess what was testified to at trial about prior threats perhaps.

Looking at the facts of the case and considering Number 5 the [d]efendant treated or allowed a victim to treated with exceptional cruelty during the commission of the offense. Either he said a prayer over him or he didn't. Either way the fact that he came over him after having been shot in the back and stood over him and basically finished him off; if he in fact said a prayer over him how callous and cruel can you be.

And if it didn't happen then he lied to me. So, one of the two. Either way it's just -- of course we don't know for sure whether or not victim was able or conscious to hear what he had to say.

But I think the very act of following him, standing over him and pumping another one into him is proof of premeditation. The [j]ury came back with murder second degree, but this appears to me -- first of all, you don't go to and seek out or go looking for trouble then claim post-traumatic stress. You don't do that. That's nonsense. That's absolute nonsense to go looking for trouble and then claim post-traumatic stress.

I mean, if the victim may come to his house and banged on his door, kicked his door in and then maybe I don't know that [would] spur something in him to react because of post-traumatic stress. But to claim - to go to this house and of course I guess it was his - the victim's mother that testified how did he know the victim was there.

That's something I never even considered. Said he was angry at trial, angry with him. Like I say you don't go looking for trouble and then try to claim post-traumatic stress. So the mental illness really doesn't jive as far as claiming post-traumatic stress. A lot of us have post-traumatic stress for things that happen in our lives. Things that you can't get out of your mind.

But then to use that to claim that well, I went over there and then all of a sudden this post-traumatic stress kicked in. That's just nonsense. So -- then this claim self-defense and then accident and then -- it appears to me by a preponderance of the evidence this with (sic) a murder first degree.

The [j]ury came back murder second and we have to accept their verdict. So, I think that 5 does apply. I think it was cruel. I think whether or not he said a prayer over him or whether or not [the] victim actually heard the prayer,

the fact that he was dying and he pumped another one into him I guess I don't know. I forgot if he said he did it to put him out of his misery. I don't know. That's pretty twisted right there.

So 5 I do believe applies. It doesn't apply as much as Number 9. Here we have a guy that claims that he had all these mental problems and yet he was in the service helping people with problems in the same situation that he had supposedly. That's what I gathered from his testimony and from what his job was until 2016 helping people readjust to society and whatnot.

He should have known better to even have possessed a gun. He shouldn't have had a gun. So, we have someone who is very intelligent. I didn't see any evidence of when he started taking these meds. For all I know he didn't start taking them until after he was arrested.

I don't really see what the unusual circumstances were unless you want to try and claim it was post-traumatic stress, but like I say that's nonsense. Well, he was military and served honorably apparently. Did the military record show that he was discharged for mental reasons?

. . .

Of course he possessed and employed a firearm during the commission of this offense. A fireman that apparently he shouldn't have had. Did y'all find anything with the Administrative Office of the Court?

. . .

Anyway, there were two aggravating circumstances starting at 15 like I guess the statute says. These [are] advisory, but yet taking into consideration the fact that by a preponderance of the evidence this was a murder first degree. I mean, how could it be self-defense and an accident and a post-traumatic? It's just not.

You don't shoot someone in the back, follow them and while they're laying (sic) on the ground pump one into their chest. I find that the mental illness had nothing to do with this. I don't believe it was unusual circumstances. He said he was mad at him and he went there to confront him. Again, I don't know how he knew he was there, which you take into consideration 404(b) and that the testimony of the mother he could have just as well had been for the victim's mother.

Prior military service I put weight in that. But then again, special training from that. And he had every opportunity to address whatever issues he had if that case in fact were true. Then this wouldn't have happened I suppose. If he had addressed those issues. Very intelligent.

So, I guess his military service, serving his country [is] something to consider, but then again, it was also the other part of it that he had this special training he had and he should have availed himself for whatever things they have for people supposedly with post-traumatic stress. He didn't avail himself of that.

He's done a lot of things since he's been in jail, but that's kind of like I don't know a day late and a dollar short. He should have those -- he should have done those things I suppose before all of this happened.

So, I put great weight in the fact that there was the use of a handgun that he shouldn't have had and that he really committed a murder first degree in my opinion. By a preponderance of the evidence this was a murder first.

I think the fact that it was done with a handgun and I think it was cruel. I think it outweighs, far outweighs the lack of prior record that he has, which is good I suppose and his military service.

So, weighing them against each other I think 22 years is an appropriate sentence.

As evidence above, the record indicates the trial court properly considered all of the statutory factors and weighed the applicable enhancement and mitigating factors before determining the defendant's sentence. Tenn. Code Ann. § 40-35-210(b). In doing so, the trial court determined the use of a deadly weapon and exceptional cruelty enhancement factors outweighed any mitigating factors. Tenn. Code Ann. § 40-35-114(5), (9). Nothing in the record indicates the trial court abused its discretion in making that determination as it is clear the defendant fired numerous fatal shots at the victim, first in the back and then, after consideration, in the chest, from a close range. Furthermore, our supreme court has made clear that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, the defendant is not entitled to relief, and we affirm the twenty-two-year sentence to be served in the Tennessee Department of Correction.

*Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
J. ROSS DYER, JUDGE